# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

NAVAJO NATION and NORTHERN EDGE
NAVAJO CASINO,

        Plaintiffs,

v.                                Case. No.15-cv-00799

The Honorable BRADFORD J. DALLEY,
District Judge, Eleventh Judicial District, New
Mexico, in his Official Capacity; HAROLD
McNEAL; and MICHELLE McNEAL,

        Defendants.

---

*Appearances:*
*For Plaintiffs Navajo Nation and Northern*
*Edge Navajo Casino:*
PATRICK THOMAS MASON
Mason & Isaacson, PA
P.O. Box 1772
Gallup, NM  87301

*For Defendant Bradford Dalley:*
HECTOR BALDERAS
Attorney General for the State of New Mexico
Office of the Attorney General
P.O. Box 1508
Santa Fe, NM 87504-1508

*By*: PEGGY (MARGARET) ALISON
DUGGAN
Assistant Attorney General
Civil Litigation Division
P.O. Box 1508
Santa Fe, NM 87504-1508
505-827-6024

*For Defendants Harold McNeal and Michelle*
*McNeal:*
DANIEL M. ROSENFELT
LINDA J. RIOS
Rios Law Firm
P.O. Box 3398
Albuquerque, NM 87110

1

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Navajo Nation and Northern Edge Navajo Casino's (collectively "Plaintiffs'") motion for summary judgment and a declaration by this Court that "the Indian Gaming Regulatory Act . . . does not permit the shifting of jurisdiction from tribal courts to state courts in personal injury lawsuits against tribal enterprises" [Doc. 12]. Defendant Bradford Dalley ("Judge Dalley") and Harold and Michelle McNeal (the "McNeals") (collectively "Defendants") filed separate oppositions to Plaintiffs' motion [Docs. 13, 17–18]. Plaintiffs timely replied in support of their motion [Doc. 19].

The Court, having considered the motions, briefs and relevant law, and being otherwise fully informed, finds that Plaintiffs' Motion will be DENIED.  Because the facts of this case are not in dispute and there are no legal issues remaining to be resolved, this matter is hereby DISMISSED.

## BACKGROUND

This case comes before the Court following a routine slip-and-fall lawsuit argued before the Honorable Bradford J. Dalley in New Mexico District Court.  Although the causes of action in this lawsuit are relatively mundane, the jurisdictional issues presented to this Court are not.  In the tribal-state gaming compact between the Navajo Nation and the State of New Mexico ("Tribal-State Compact"), Doc. 12-1, the Navajo Nation and the State of New Mexico agreed that tort actions related to Indian gaming that arose on Navajo tribal land could be adjudicated in New Mexico district court.  In this declaratory judgment action, Plaintiffs have asked this Court to state that the Navajo Nation lacked sufficient authority to grant New Mexico district courts jurisdiction over personal injury actions arising in gaming facilities in Indian country when signing the Tribal-State Compact.  The Honorable Bradford J. Dalley, the New Mexico District

Court Judge whom presides over the slip-and-fall action at issue, in combination with the plaintiffs in that action, Harold and Michelle McNeal, are the Defendants in this case. They assert, with the assistance of the New Mexico Attorney General, that the Navajo Nation did have sufficient authority to grant the State of New Mexico jurisdiction over the slip-and-fall at issue here because the Navajo Nation has both the inherent authority as a sovereign nation to grant New Mexico jurisdiction and because Congress has granted the Navajo Nation authority under the Indian Gaming Regulatory Act ("IGRA") to negotiate the Tribal-State Compact.

A brief summary of the convoluted history of Indian gaming in New Mexico will help explain why, paradoxically, the Navajo Nation is seeking a declaration by this Court against its own authority to enter into Section 8 of the Tribal-State Compact, while the State of New Mexico is attempting to affirm the sovereign authority of the Navajo Nation.

## I.    <u>Indian Gaming Before IGRA[1]</u>

Large-scale commercial Indian gaming is a creature of the 20th century. By the late 1970s, "a few tribes, and at least one individual Indian, had [] begun to engage in certain forms of gaming, primarily bingo." Franklin Ducheneaux, *The Indian Gaming Regulatory Act: Background and Legislative History*, 42 ARIZ. ST. L.J. 99, 108 (2010) (hereinafter "*Ducheneaux*"); NEIL JESSUP NEWTON & ROBERT ANDERSON, *ET AL.*, COHEN'S HANDBOOK OF

---

[1] With the exception of contested legislative history, unless the Court indicates otherwise, to the extent any of the following facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court did not rely on the disputed evidence.

The following two sections describe the relevant legislative history of IGRA as a backdrop to the Tribal-State Compact at issue in this case. Although the parties take somewhat different views regarding the legislative history of IGRA, *compare* Doc. 12, Pls. MSJ, at 11–15, *with* Doc. 17, McNeals' Opp. to MSJ, at 7–11, disputes over legislative history are generally considered legal, rather than factual, disputes. *See Edwards v. Aguillard*, 482 U.S. 578, 594 (1987) (considering legislative history in affirming a decision for summary judgment); NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 48:1 (7th ed. 2015). As a result, it is appropriate for the Court to consider contested legislative history in resolving a motion for summary judgment.

FEDERAL INDIAN LAW § 12.01 (LexisNexis 2012) (hereinafter "COHEN") ("Indian gaming began to develop as a source for commercial revenue for tribes in the 1970s, primarily as high stakes bingo operations."). Because these Indian gaming activities "were not conducted under state licensure and were often in technical violation of other state regulatory laws, state officials began to challenge the legality of these activities in federal and state courts." *Ducheneaux* at 108. As a result of the various regulatory actions against Indian tribes initiated by state officials in the 70s and 80s, a series of state and federal precedents began to develop regarding the scope of the various Indian Tribes'[2] ability to run gaming facilities on Tribal lands. *E.g.*, *Seminole Tribe of Florida v. Butterworth*, 658 F.2d 310 (5th Cir. 1981); *Barona Grp. of Capitan Grande Band of Mission Indians, San Diego Cty., Cal. v. Duffy*, 694 F.2d 1185 (9th Cir. 1982). The cumulative result of this precedent was a determination by federal courts that states "generally lack[ed civil] regulatory authority over Indian people on Indian reservations." COHEN at § 12.01.

According to Franklin Ducheneaux,[3] the primary drafter of the Indian Gaming Regulatory Act:

> The state of the law, prior to the enactment of IGRA, was clear. Where the laws of a state prohibited gambling for all persons as a matter of criminal law, tribes within that state could not engage in, or license and regulate, gambling. This was because federal law . . . made the state's criminal law applicable in Indian country. Conversely, where state law permitted gambling and regulated it under civil laws, tribes within that state could engage in, or license and regulate, gambling free of state control. Again, this was because state civil/regulatory law is not applicable [on tribal land].

---

[2] For the purposes of this opinion, the various sovereign Indian entities will be referred to as "Tribes." *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1548 n.1 (10th Cir. 1997) (referring to New Mexican Pueblos as "Tribes").

[3] Ducheneaux, Counsel on Indian Affairs for the Committee on Interior and Insular Affairs at the United States House of Representatives, drafted the various house bills that became IGRA, *Ducheneaux* at 99. Although the bill that ultimately passed and became IGRA was a Senate bill, S. 555, the Senate bill was based largely on Congressman Udall's House bill, H.R. 2407, which was the focal point of the negotiations in the Senate Committee. *Ducheneaux* at 164–65. Ducheneaux was a party to these negotiations. *Id.*

*Ducheneaux* at 110.  Restated, by the mid-1980s, federal courts had determined that, based on existing federal law, states that allowed gambling could not prohibit Indian gaming, and, within the borders of those states, state regulations such as licensing requirements would not apply to Indian gaming facilities due to federal preemption.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217 (1987) (affirming previous lower-court decisions); Cohen at § 12.01 ("the state's laws [applying civil regulations to Indian gaming] were preempted, because the state had not shown a sufficient interest to overcome the tribal and federal interests at stake in allowing tribal gaming to continue free of state regulation, in light of the state's authorization and encouragement of gambling in many forms").

Many Tribes recognized the potential revenue that could be generated by Indian gaming following these federal court decisions and "tribes across the country began to establish gaming enterprises."   Rebecca Tsosie, *Negotiating Economic Survival: The Consent Principle and Tribal-State Compacts Under the Indian Gaming Regulatory Act*, 29 Ariz. St. L.J. 25, 47 (1997) (hereinafter "*Tsosie*"); Cohen at § 12.01 (stating that as a result of favorable federal precedent on the issue "Indian tribes across the country began developing high stakes bingo and other gaming operations in the late 1970s and 1980s"); *see Indian Gambling Control Act: Hearing on H.R. 4566 Before the House Committee on Interior and Insular Affairs*, 98th Cong. 59–65 (1984) (statement of John Fritz, Deputy Assistant Secretary for Indian Affairs) (describing the growth in Indian gaming).  The decisions by various Tribes to invest in Indian gaming was particularly important given the drastic cuts in social programs and federal assistance to the Tribes enacted by the federal government in the 1980s.  *Ducheneaux* at 110–12; *see Tsosie* at 43.  In the Navajo Nation, after the cuts in federal assistance in the 80s, "more than 45 percent of families live[d] in

poverty."  Naomi Mezey, *NOTE: The Distribution of Wealth, Sovereignty, and Culture Through Indian Gaming*, 48 STAN. L. REV. 711, 714 (1996) (hereinafter "*Mezey*").[4]

Although Indian gaming seemed to many to be a solution to the sudden withdrawal of federal programs assisting the Tribes in the 1980s, states "resent[ed]" the fact that they could not regulate Indian gaming under existing precedent, particularly "the fact that they lack[ed] the authority to tax reservation income[.]"  Nancy Thorington, *Civil and Criminal Jurisdiction over Matters Arising in Indian Country: A Roadmap for Improving Interaction Among Tribal, State and Federal Governments*, 31 MCGEORGE L. REV. 973, 1019 (2000); *see Tsosie* at 44 (summarizing arguments against Indian gaming in Arizona).  As a result of the various state pressures against Indian gaming, states began to push for federal regulation of Indian gaming, including aggressively litigating in federal court to limit Indian gaming and lobbying Congress to pass a federal statute regulating Indian gaming.  Georgetown University Law Professor Naomi Mezey has described the conditions giving rise to IGRA as "a sovereignty battle in the courts between states and tribes.  As states sought to prohibit tribal gaming as inconsistent with state law, the battle focused on the scope of American Indians' right to game."  *Mezey* at 718, 735 ("gaming was simply the 'right' over which states and tribes fought that particular sovereignty battle").  Because of the existing federal precedent on the matter that provided relatively expansive interpretations of Tribal sovereignty vis-à-vis the states, "[b]efore IGRA was enacted, states played a very limited role in Indian gaming."  COHEN at § 12.02.

---

[4] The poverty rate in the Navajo Nation remains remarkably high.  According to the U.S. Census Bureau, approximately 71,000 of 166,000 Navajo Indians living on Navajo land live below the poverty level.  U.S. Census Bureau, 2010–14 American Community Survey 5-Year Estimates: Poverty Status in the Past 12 Months by Sex and Age, Navajo Nation Reservation and Off-Reservation Trust Land, AZ—NM—UT, http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_14_5YR_B17001C&prodType=table (last accessed July 8, 2016).

To summarize, as Tribes across the country began opening Indian gaming facilities, states brought lawsuits in federal court to limit Indian gaming. However, federal courts generally ruled in favor of the Tribes and prevented state regulation. States then changed their strategy and began to lobby Congress to create a federal statute that would regulate Indian gaming. As a result of the pressure from the states to expand their ability to regulate Indian gaming, IGRA came into existence as the United States "Congress took action to address the growing public policy questions arising from Indian gaming." COHEN at §12.01.

**II.      The Passage of IGRA and the Creation of Tribal-State Compacts**

Worried about the growing backlash against Indian gaming in the states, Congressman Morris K Udall (D-Ariz.) introduced H.R. 4566 in 1983, which was the first formally proposed version of what would later become IGRA. *Ducheneaux* at 113–23. Although Congressman Udall proposed the bill to "forestall a possible reversal [by the Supreme Court] of the Federal court decisions, which had thus far supported the Indian tribes' right to engage in gaming free of state and federal regulation," the bill was ultimately defeated, in part by lobbying efforts from the National Congress of American Indians and the National Tribal Chairmen's Association, which saw the bill as an affront to Tribal sovereignty and an attempt to increase the influence of the states over Indian gaming. *Ducheneaux* at 122. However, when Congressman Udall reintroduced the bill in 1985 as H.R. 1920, the various lobbying groups in favor of Indian gaming switched their position and threw their support behind Congressman Udall's bill. *Ducheneaux* at 124–28. This is because, in the intervening time, Congressman Shumway (R-Cal.) and Congressman Bereuter (R-NE) had proposed legislation that would have gone much further in curtailing Indian gaming, and the lobbying groups supporting Indian gaming saw Congressman Udall's bill as a lesser threat to the Indian gaming business and Tribal sovereignty

than the bills proposed by Congressman Shumway and Congressman Bereuter. *Ducheneaux* at 128–29. *Tsosie* at 48–49 (worried about the nationwide increase in Indian gaming, the states "lobbied furiously for passage of congressional legislation on Indian gaming. . . . States asserted that legislation was necessary to prevent the potential infiltration of organized crime and also to protect state-regulated gambling from 'unfair economic competition.'"). The California delegation in particular had a powerful presence in Congress and a strong incentive to limit Indian gaming. *Ducheneaux* at 128–29 (stating that there was "strong opposition to Indian gaming coming from the State of California. California's public policy clearly favored gambling, which included stud poker card parlors, charitable bingo operations, and pari-mutuel horseracing. Indian gaming, in addition to being free of state control, was a threatening competition to those forms of gaming."). Ultimately H.R.1920 was defeated because various congressmen, including Congresspersons Tony Coelho (D-Cal.), Beverly Byron (D-MD), Jim Moody (D-WI), and Manuel Lujan (R-NM), did not think H.R. 1920 went far enough in regulating casino-style "Class III"[5] Indian gaming. *Ducheneaux* at 141–42.

After several years of negotiation focused primarily on the treatment of Class III gaming, *Ducheneaux* at 150–170, and an intervening Supreme Court decision affirming the rights of Tribes to engage in Indian gaming operations, *California v. Cabazon Band of Mission Indians*, a compromise between the various pro-Class III gaming and anti-Class III gaming factions was reached and Congress passed the Indian Gaming Regulatory Act. *Ducheneaux* at 166–70; COHEN at § 12.02 ("The Indian Gaming Regulatory Act of 1988 (IGRA) was designed to balance

---

[5] Federal regulation of Indian gaming divides various games into Class I, Class II, and Class III games. 25 U.S.C. § 2703 (6) – (8) (defining Class I, Class II, and Class III gaming); Cohen at § 12.03. Class III games are casino-style games, slot machines, and lotteries that bring in substantial outside revenue. 25 U.S.C. § 2703 (8). Class II games are games of chance, predominantly bingo-style games. 25 U.S.C. § 2703 (7). Class I games are traditional Tribal games that produce little outside revenue. 25 U.S.C. § 2703 (6). Because for most Tribes Class III gaming was the most lucrative, lobbying efforts for-and-against Indian gaming focuses mostly on Class III gaming. *Ducheneaux* at 150–170.

the interests of states, tribes, and the federal government.").   As this Court has previously explained, "in 1988, in the wake of *Cabazon,* Congress enacted [IGRA], 25 U.S.C. §§ 2701–2721, to balance the states' interest in regulating high stakes gambling within their borders and the Indians' resistance to state intrusions on their sovereignty."   *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1288–90 (D.N.M. 1996) (Vázquez, J.) (citing S.Rep. No. 100–446, 100th Cong., 2d Sess. at 13), *aff'd*, 104 F.3d 1546 (10th Cir. 1997).   The Act established a statutory framework for the growing Indian gaming industry which "expressly pre-empt[s] the field of governance of gaming activities on Indian lands." *Id.*; S.Rep. No. 100–446 at 6, 100th Cong., 2nd Sess., 1988 U.S. Code Cong. & Admin. News 3071, 3076.

The essence of the compromise between the Tribes and the states regarding the regulation of Class III gaming is reflected in Section 11(d) of IGRA, codified at 25 U.S.C. § 2710(d), which set forth the procedures for the negotiation of Tribal-State compacts that would allow Tribes and the States to negotiate for themselves the scope of Class III Indian gaming on various tribal lands.   *Tsosie* at 33 ("The model [of negotiation between the states and the tribes] was then formalized into the structure of the Indian Gaming Regulatory Act to address tribal-state disputes over reservation gaming."); *Ducheneaux* at 176–77.   Here, it is worth quoting Ducheneaux's summary of the legislative history of Section 11(d) at length:

> Subsection (d) of section 11 of IGRA comprehensively provides for the conduct and regulation of class III gaming on Indian lands.  As discussed above, the anti-Indian gaming forces in Congress eventually conceded the right of tribes to engage in, and regulate, class II gaming free of state control and generally free of federal regulation. They insisted, however, that class III or what was called casino or 'hard core' gaming either be federally prohibited or subject to state control and regulations. The tribes insisted on their right to engage in class III gaming, as set out in the *Cabazon* decision, free of State control. This issue was the major source of discussion in the negotiations in the 100th Congress. The compromise adopted set out the Tribal-State compact procedure.

> The provision made class III gaming illegal on Indian lands unless conducted pursuant to a Tribal-State compact.  However, in recognition that this provision standing alone would put tribes at the mercy of hostile states, the section authorized tribes to sue states that refused to negotiate or that negotiated in bad faith.

*Ducheneaux* at 176.  In short, the result of the congressional debate over the passage of IGRA is that "the tribe and the state share control over Class III gaming." *Mezey* at 721; *see Tsosie* at 51 ("the IGRA mandates an existing compact before the tribe can commence Class III gaming.").  Cohen summarizes the compromise over Class III gaming as follows:  "Congress gave the states a significant role in class III games, which can only be conducted pursuant to tribal-state compacts approved by the Secretary of the Interior.  States that permit gaming are required to negotiate compacts in good faith with tribes or face suit in federal court or imposition of gaming procedures by the Secretary of the Interior."  Cohen at § 12.02.  The result of the requirement that Tribes conduct Class III gaming according to tribal-state compacts creates an "irony that the IGRA, predicated on tribal sovereignty, subjects tribal gaming to such detailed regulation and oversight that it arguably asks tribes to sacrifice sovereignty in order to exercise . . . their right to game." *Mezey* at 719.  "To give states more authority, Congress had to transfer the gaming right from tribes to the federal government, and then dole it out anew between the states and tribes.  The result is the federal redistribution of state and tribal sovereignty[.]" *Mezey* at 736.

To summarize, IGRA is the product of various lobbying efforts by the pro- and anti-Indian gaming camps.  The heart of the dispute was how the lucrative Class III "Casino-style" gaming would be regulated.  Section 11(d) of IGRA punted that question to the various parties interested in the question (the Tribes and the states) by requiring the parties to negotiate tribal-state compacts between themselves before Class III gaming can occur on Tribal land.

As a result of the passage of Section 11(d) of IGRA, the Navajo Nation is required to negotiate a Tribal-State Compact with New Mexico if it wants to conduct Class III Indian gaming operations on Tribal land.  As described below, the Navajo Nation negotiated such a compact with the State of New Mexico, and the scope of that compact, as well as the Navajo Nation's authority to enter into various provisions of it, is the subject of the current declaratory judgment action.

### III.   The Tribal-State Compact Between the Navajo Nation and the State of New Mexico

COHEN summarizes the role of Tribal-State Compacts as follows:  "The Indian Gaming Regulatory Act of 1988 (IGRA) was designed to provide states a role in certain kinds of Indian gaming by encouraging tribes and states to enter into cooperative agreements to permit class III gaming on Indian lands within a state, subject to the approval of the Secretary of the Interior." COHEN at § 12.05.  In New Mexico, the signing of the tribal-state compacts first occurred in the mid-1990s. "Indian gaming became a significant campaign issue in the 1994 gubernatorial campaign. Governor King was defeated for reelection by Gary Johnson, who had publicly committed to signing Tribal–State compacts if elected Governor."  *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1550 (10th Cir. 1997).  At that same election, voters approved a constitutional amendment authorizing a state lottery and legalizing video gambling. *See State ex rel. Clark v. State Canvassing Bd.,* 119 N.M. 12 (1995).  After the people of New Mexico elected Governor Johnson, the Governor:

> [A]ppointed Professor Fred Ragsdale to negotiate compacts with various Indian tribes, and on February 13, 1995, he signed thirteen identical compacts. The Secretary of the Interior approved twelve of the compacts on March 15, 1995, and published notice of such approval in the Federal Register on March 22. The thirteenth compact, between the Pueblo of Acoma and the State, was approved by the Secretary on April 24, and notice was published in the Federal Register on May 15.

*Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1550 (10th Cir. 1997).  In the run-up to the signing of the compact, New Mexico Tribes "construct[ed] new or improved gaming facilities, and ha[d] implemented various tribal programs with existing gaming revenues or in anticipation of such revenues." *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1550 (10th Cir. 1997).  At that time, the presence of Indian gaming was "a major source of income for the Tribes."  *Id.*

Although Governor Johnson negotiated and ultimately signed the compact, Governor Johnson failed to seek approval from the New Mexico state legislature for the deal.  *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1290–91 (D.N.M. 1996) (Vázquez, J.), *aff'd*, 104 F.3d 1546 (10th Cir. 1997).  The United States District Court for the District of New Mexico, *id.*, and the New Mexico Supreme Court, *State ex rel. Clark v. Johnson,* 120 N.M. 562 (1995), ruled that this action violated IGRA and the New Mexico Constitution.  The Tenth Circuit affirmed this Court's decision in *Pueblo of Santa Ana v. Kelly*. 104 F.3d 1546, 1555 (10th Cir. 1997).

As a result of these developments, the previous tribal-state compacts were invalidated and the New Mexico State Legislature adopted the Compact Negotiation Act, which formalized the process for compact negotiations between the Tribes and New Mexico and allowed the process to begin anew, this time with adequate legal foundation. N.M. Stat. § 11-13A-1 *et seq.*; NEW MEXICAN GAMING CONTROL BOARD, NEW MEXICAN INDIAN GAMING HISTORICAL PERSPECTIVE, http://www.nmgcb.org/history.aspx (last accessed July 8, 2016).  The State of New Mexico and the Navajo Nation conducted negotiations pursuant to IGRA and the Compact Negotiation Act and entered into a formal Tribal-State Compact in 2003.  Doc. 12-1, Tribal-State Compact.  The Navajo Nation Council approved the compact by a vote of 59 to 13.  Doc. 17, McNeals' Opp. to MSJ, at 4 ¶ 6; Doc. 17-3, Resolution of the Navajo Nation Counsel, at 1 ¶ 2

(noting that sovereign immunity cannot be waived without a 2/3 majority vote of the full membership of the counsel).

The Secretary of the Interior approved the Tribal-State Compact between the State of New Mexico and the Navajo Nation (the "Tribal-State Compact") in January of 2004 pursuant to 25 U.S.C. 2710 (d)(3)(B).  Doc. 17, McNeals' Opp. to Pls. MSJ, at 3 ¶ 1.    The Tribal-State Compact contains the following provisions relevant to this case:

## INTRODUCTION

The State of New Mexico ("State") is a sovereign State of the United States of America . . . and is authorized by its constitution to enter into contracts and agreements, including this Compact, with the Nation;

The Navajo Nation ("Nation") is a sovereign federally recognized Indian tribe and its governing body has authorized the officials of the Nation to enter into contracts and agreements of every description, including this Compact, with the State;

The Congress of the United States has enacted the Indian Gaming Regulatory Act of 1988 . . . which permits Indian tribes to conduct Class III Gaming on Indian Lands pursuant to a tribal-state compact entered into for that purpose;

. . .

The State and the Nation, in recognition of the sovereign rights of each party and in a spirit of cooperation to promote the best interests of the citizens of the State and the members of the Nation, have engaged in good faith negotiations recognizing and respecting the interests of each party and have agreed to this Compact.

. . .

## TERMS AND CONDITIONS

. . .

SECTION 8. Protection of Visitors.

A. Policy Concerning Protection of Visitors. The safety and protection of visitors to a Gaming Facility is a priority of the Nation, and it is the purpose of this Section to assure that any such persons who suffer bodily injury or property

damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation. To that end, in this Section, and subject to its terms, the Nation agrees to . . . a limited waiver of its immunity from suit, and agrees to proceed either in binding arbitration proceedings or in a court of competent jurisdiction, at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise. For purposes of this Section, any such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.

. . .

D. Specific Waiver of Immunity and Choice of Law. The Nation, by entering into this Compact and agreeing to the provisions of this section, waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage up to the amount of ten million dollars ($10,000,000) per occurrence . . . . The Nation agrees that in any claim brought under the provisions of this Section, New Mexico law shall govern the substantive rights of the claimant, and shall be applied, as applicable, by the forum in which the claim is heard, except that the tribal court may but shall not be required to apply New Mexico law to a claim brought by a member of the Nation.

Doc. 12-1, Tribal-State Compact, at 1–2, 14–15 (emphasis added).

## IV.    The State Court Action

In July of 2012, Harold McNeal visited the Northern Edge Navajo Casino, a wholly owned government enterprise of the Navajo Nation located on Navajo Nation Land in San Juan County, New Mexico.  Doc. 12, Pls. MSJ, at 2 ¶¶ 1–2.  The Navajo Nation operates the Northern Edge Navajo Casino pursuant to the Tribal-State Compact.  *See* Doc. 12, Pls. MSJ, at 2–4 ¶¶ 1–3, ¶ 8. On July 6, 2012, Harold McNeal allegedly went into the bathroom at the southwest end of the Northern Edge Navajo Casino where he slipped on a wet floor and was injured.  Doc. 3-2, State Court Compl., at 3 ¶ 20.

The McNeals filed a complaint of tortious negligence against Northern Edge Navajo Casino, the Navajo Nation, and unknown Navajo Nation employees based on the above facts in New Mexico district court on August 4, 2014.  *See* Doc. 3-2, at 1.  Judge Dalley, a judge sitting

14

in the Eleventh Judicial District Court of New Mexico, is the judge presiding over that case. Doc. 12, Pls. MSJ, at 3 ¶ 6.

In September of 2013, United States Senior District Court Judge Leroy Hansen ruled that "[t]he IGRA only authorizes the extension of state jurisdiction to enforce criminal and civil laws and regulations 'directly related to, and necessary for, the licensing and regulation' of tribal gaming activities[.]"  Doc. 3, Compl., at 4 ¶ 11 (citing *Pueblo of Santa Ana v. Nash*, 972 F. Supp. 2d 1254 (D.N.M. 2013).  This action shares some similarities to the declaratory judgment action the Pueblo of Santa Ana successfully submitted before Judge Hanson.  Doc. 3, Compl., at 4 ¶ 11.

Seeking to halt the state court action from proceeding, Plaintiffs in this federal matter (the Navajo Nation and Northern Edge Navajo Casino), filed a declaratory judgment action in the United States District Court for the District of New Mexico on September 21, 2915 in order to prevent Judge Dalley from exercising state-court jurisdiction over the McNeals' lawsuit.  *See* Doc. 3, Compl.

ANALYSIS

## I.   <u>Declaratory Judgment</u>

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The Federal Rules of Civil Procedure explicitly provide for a court to hear a declaratory judgment action.  FED. R. CIV. P. 57 advisory committee's note to 1937 amendment (providing that a declaratory judgment action may be entertained as long as the case or controversy is otherwise justiciable).

Declaratory relief is generally only appropriate if there are no "genuine issues of fact[.]"  *United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1149 (10th Cir. 1974).  In this case, the facts are not in dispute, Doc. 13, Dalley Opp. to MSJ, at 1 ("the Honorable Bradford J. Dalley[] does not dispute the material facts presented in the Plaintiffs Motion for Summary Judgment"); *see* Doc. 17, McNeal Opp. to MSJ, at 3–4 (accepting Plaintiffs' facts and alleging additional facts); Doc. 19, Pls. Reply ISO MSJ (not disputing the McNeals' additional facts), and the case is ripe for review because it seeks to clarify the jurisdiction of a state court within the District of New Mexico regarding a pending tort action.  Doc. 12, Pls. MSJ, at 2.  This justiciable controversy is therefore appropriate for declaratory judgment.

## II.  <u>Summary Judgment</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993).  The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."  *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the

burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).   The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 650 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).   If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.   *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

Here, the facts are not in dispute.   Doc. 13, Dalley Opp. to MSJ, at 1; *see* Doc. 17, McNeal Opp. to MSJ, at 3–4; Doc. 19, Pls. Reply ISO MSJ.   Although the parties take somewhat different views regarding the legislative history of IGRA, *compare* Doc. 12, Pls. MSJ, at 11–15, *with* Doc. 17, McNeals' Opp. to MSJ, at 7–11, disputes over legislative history are generally considered legal, rather than factual, disputes.   *See Edwards v. Aguillard*, 482 U.S. 578, 594 (1987) (considering legislative history in affirming a decision for summary judgment); NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 48:1 (7th ed. 2015) (hereinafter "SUTHERLAND").   Because there are no non-legislative history facts in dispute, summary judgment is appropriate in this case.   FED. R. CIV. P. 56.

17

### III. <u>New Mexico State Court Jurisdiction</u>

The crux of the dispute in this case is whether the Navajo Nation has the authority to allow civil law tort actions on Navajo land related to Indian gaming to be adjudicated by New Mexico courts.  Section 8 of the Tribal-State Compact waives sovereign immunity for personal injury claims related to Indian gaming on Tribal land and specifically authorizes New Mexico courts to exercise jurisdiction over tort claims arising on Tribal land in connection with Indian gaming.  It provides that: "[f]or purposes of this Section, <u>any such claim may be brought in state district court</u>, including claims arising on tribal land, unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court."  Doc. 12-1, Tribal State Compact, at 14 (emphasis added).  Section 8 further provides that "[t]he Nation, by entering into this Compact and agreeing to the provisions of this section, waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage[.]"  *Id.* at 15.  In short, the Tribal-State Compact presumptively confers jurisdiction to the New Mexico District Court over the action in question "unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction[.]"  *Id.* at 14.

In this declaratory judgment action, Plaintiffs assert two theories against the presumption of New Mexico State Court jurisdiction contained in Section 8 of the Tribal-State Compact.  First, because the Navajo Nation Sovereign Immunity Act, 1 N.N.C. §§ 551 *et seq.*, precludes the shifting of jurisdiction absent specific circumstances and because the Navajo Nation Sovereign Immunity Act only allows the Navajo Nation to be sued in the courts of the Navajo Nation, the terms of the Tribal-State Compact could not shift jurisdiction to New Mexico courts because the Navajo Nation Council had no authority to agree to this jurisdictional shift.  Doc. 12, Pls. MSJ, at

7–9; Doc. 19, Reply ISO MSJ, at 3–5.  Second, Plaintiffs argue that IGRA does not authorize Tribal-State Compacts to shift jurisdiction to New Mexico courts and therefore federal law has preempted any attempt to shift jurisdiction to New Mexico courts in this area.  Doc. 12, Pls. MSJ, at 9–15; Doc. 19, Reply ISO MSJ, at 5–8.

Defendants attempt to defeat the first of Plaintiffs' theories by arguing that as an inherently sovereign Tribe, the Navajo Nation did have the authority to enter into the Tribal-State Compact and shift jurisdiction to New Mexico courts regardless of prior Navajo law to the contrary.  Doc. 13, Dalley Opp. to MSJ, at 2–3; Doc. 17, McNeal Opp. to MSJ, at 17–18. Second, Defendants argue that IGRA provides the Tribes and states broad discretion in negotiating Tribal-State Compacts and therefore IGRA itself confers on the parties the authority to shift jurisdiction to New Mexico courts.  Doc. 17, McNeal Opp. to MSJ, at 4–16.

### a. The Navajo Nation's Authority to Enter into a Jurisdiction-Shifting Agreement

Tribes possess broad, inherent sovereignty to govern the affairs of Tribal members and Tribal lands.  *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138 (1982) ("Indian Tribes "possess[] sovereignty over both their members and their territory.") (quotations removed).  The basic principles of Indian law dictates that those powers that are lawfully vested in an Indian tribe are not, in general, delegated powers granted by express acts of Congress, but rather "inherent powers of a limited sovereignty which has never been extinguished." *United States v. Wheeler*, 435 U.S. 313, 322 (1978)).  "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a 'necessary result' of their . . . status." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 204 (1978).  As this Court previously observed, "[i]t is clearly established law that Indian tribes do not derive their sovereign powers from congressional delegation.  Rather, tribal sovereignty is inherent, and tribes retain attributes

19

of sovereignty over both their members and their territory, to the extent that sovereignty has not been withdrawn by federal statute or treaty." *Kerr–McGee v. Farley,* 915 F.Supp. 273, 277 (D.N.M.1995), *aff'd* 115 F.3d 1498 (10th Cir.1997) (*citing Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 14 (1987)).

In addition to the Tribes inherent sovereignty, numerous acts of Congress reinforce the principle of Tribal sovereignty, and the Supreme Court has recognized that, "[t]hrough various Acts governing Indian tribes, Congress has expressed the purpose of fostering tribal self-government." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138 (1982) (citations removed). As a result of both the Navajo Nation's inherent sovereignty and repeated congressional action designed to foster tribal self-government, it is well-established that "Indian tribes retain attributes of sovereignty over both their members and their territory," *United States v. Mazurie,* 419 U.S. 544, 557 (1975); *Cheromiah v. United States*, 55 F. Supp. 2d 1295, 1302–04 (D.N.M. 1999) (Vázquez, J.).

As sovereign entities, Tribes are generally entitled to sovereign immunity, including immunity from suit in state courts. *Romanella v. Hayward*, 933 F.Supp. 163, 167 (D. Conn. 1996); *see Williams v. Lee*, 358 U.S. 217, 220 (1959). However, while Tribes generally possess broad sovereignty over matters on Tribal land and matters regarding Tribal members, Tribal sovereignty is, in at least some instances, "subordinate to . . . the Federal Government." *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 154 (1980); *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207 (1987). Consequently, an action by Congress may abrogate tribal immunity from state suit. *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,* 523 U.S. 751, 754 (1998) ("[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived

its immunity").  A Tribe may also waive immunity by consenting to suit in a specific forum. *See Santa Clara Pueblo v. Martinez,* 436 U.S. at 58; *Kizis v. Morse Diesel Int'l, Inc.*, 260 Conn. 46, 53–54 (2002). "However, such waiver may not be implied, but must be expressed unequivocally." *McClendon v. United States,* 885 F.2d 627, 629 (9th Cir.1989).

In determining jurisdiction over civil law matters on Tribal lands, the Supreme Court has held that "Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest." *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 155 (1980).  In the context of Indian gaming, state law may be applied to Tribes on their reservations pursuant to congressional authorization. *California v. Cabazon Band of Mission Indians,* 480 U.S. at 207 & 215–17; *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1288-90 (D.N.M. 1996), *aff'd*, 104 F.3d 1546 (10th Cir. 1997).  State law may also be applied to gaming activities on Indian lands if "a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands[.]" *Muhammad v. Comanche Nation Casino,* No. 09–CIV–968, 2010 WL 4365568, at *9 (W.D. Okla. Oct. 27, 2010) (citing S. Rep. 100–446, at 5–6, *reprinted in* 1988 U.S.C.C.A.N. at 3075). Only "an affirmative extension of state civil-adjudicatory jurisdiction by a tribal-state gaming compact will be sufficient" to expand state court jurisdiction to tribal gaming activities.  *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 315 P.3d 359, 364 (Okla. 2013).

Because the Tribe is an inherently sovereign entity and such an entity can waive its sovereign immunity, it is clear that the Navajo Nation can consent to suit in New Mexico state court.  The next question this Court must address is whether the Navajo Nation has appropriately done so here.

### i. *The Scope of the Navajo Nation's Waiver*

In this case, the parties do not dispute that the Navajo Nation has the inherent power to waive its sovereign immunity and can waive that immunity regarding causes of action based in New Mexico tort law. Doc. 19, Reply ISO MSJ, at 1–5; Doc. 13, Dalley Opp. to MSJ, at 1–5; Doc. 17, McNeal Opp. to MSJ, at 17–18. However, the parties dispute whether the Navajo Nation has the authority to consent to the New Mexico state court forum via Section 8 of the Tribal-State Compact.

The Navajo Nation asserts that the Navajo Nation Counsel did not have the authority to negotiate the waiver in the Tribal-State Compact regarding the specific forum for such lawsuits because a previous act by the Navajo Nation Council, the Navajo Nation Sovereign Immunity Act, prohibits future delegation of civil adjudicatory authority to courts outside Navajo Tribal land. Doc. 19, Reply ISO MSJ, at 1–5 (citing 1 N.N.C. §§ 551 *et seq.*); *see Begay v. Navajo Eng'g & Constr. Auth.*, 2011 Navajo Sup. LEXIS 1, at *5 (Navajo Sup. Ct. 2011) (ruling that satisfying the Navajo Nation Sovereign Immunity Act is a "jurisdictional condition[] precedent when the Nation, its officers, employees, or agents are sued.") (quotations omitted). The Defendants dispute these assertions. *E.g.*, Doc. 13, Dalley Opp. to MSJ, at 2.

Sections 551 through 555 of the Navajo Nation Code, the 1980 Navajo Sovereign Immunity Act, provide in pertinent part that:

> B. The Navajo Nation may be sued in the courts of the Navajo Nation when explicitly authorized by applicable federal law.
>
> C. The Navajo Nation may be sued only in the courts of the Navajo Nation when explicitly authorized by Resolution of the Navajo Nation Council.

1 N.N.C.A. § 554 (B)–(C).   Relying on this language, Plaintiffs assert that "[i]n cases of waiver by act of the Navajo Nation Council, the Sovereign Immunity Act explicitly states that such cases can be brought 'only in the courts of the Navajo Nation[.]'"   Doc. 12, Pls. MSJ, at 7.[6]

The Defendants contend that legislation by the Navajo Nation Council subsequent to the Navajo Sovereign Immunity Act cited by Plaintiffs abrogated the Act as applies to the Tribal-State Compact.  Specifically, Title 2 of the Navajo Nation Code, Section 223 provides that:

> C. Contracts shall not waive the sovereign immunity of the Navajo Nation or its entities unless approved by two-thirds (2/3) vote of the full membership of the Navajo Nation Council. This provision shall not apply to authority to waive immunity properly delegated.

2 N.N.C.A. § 223(C).   In short, Title 2, Section 223 of the Navajo Nation Code modifies the Navajo Sovereign Immunity Act by allowing the Navajo Nation Council to abrogate the Tribe's sovereign immunity by a supermajority vote.  Furthermore, the resolution by the Navajo Nation Council that consented to the Tribal-State Compact, the Resolution of the Navajo Nation Counsel Approving a Gaming Compact between the Navajo Nation and the State of New Mexico for the Conduct of Legalized Gambling, passed 59-to-13, appears to have considered Section 223 controlling:

> Pursuant to 2 N.N.C. §223(D) "Contracts shall not waive the sovereign immunity of the Navajo Nation or its entities unless approved by two-thirds (2/3) vote of the full membership of the Navajo Nation Council"; and
>
> . . .
>
> The proposed Gaming Compact includes a limited waiver of sovereign immunity. The limited waiver of sovereign immunity is substantially similar to the Navajo Sovereign Immunity Act . . . . The waiver is limited to . . . bodily injury and

---

[6] The Court notes that it is not clear on the face of the Navajo Sovereign Immunity Act that Section 554(C) precludes New Mexico from exercising her jurisdiction over tort claims where an otherwise valid waiver by the Navajo Nation exists with regard to a tort cause of action without specifically consenting to a state court forum.  *See* 1 N.N.C.A. § 554 (C).  Because Defendants have not broadly contested Plaintiffs' reading of the Navajo Sovereign Immunity Act and have instead focused their challenge elsewhere, Plaintiffs' reading is assumed herein.

> property damage and requires a vote of the full Navajo Nation Council pursuant to 2 N.N.C. § 224(D)[.]
>
> . . .
>
> The Navajo Nation Council hereby approves the proposed Gaming Compact between the Navajo Nation and the State of New Mexico[.]

Doc. 17-3, Resolution of the Navajo Nation Council, at 1–2.  Consequently, the question presented to this Court is whether either Title 2 Section 223 of the Navajo Nation Code or the Tribal-State Compact overrides the Navajo Sovereign Immunity Act's prohibition on shifting jurisdiction to New Mexico state courts.

1. <u>Navajo Law Regarding Jurisdiction Shifting</u>

This Court is not an expert on Navajo constitutional law or the specific principles of Navajo statutory interpretation.  As a result, this Court generally defers to interpretations of Navajo law by Navajo courts, particularly where the question is "intimately involved with a sovereign prerogative" such as sovereign immunity. *See Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28 (1959); LARRY W. YACKLE, FEDERAL COURTS 513–15 (Carolina Academic Press, 3rd ed. 2009).  However, the question of Navajo law presented here – whether a subsequent act of the Navajo Nation Council can modify or supersede a previous act by the Navajo Nation Council – appears to be a question of first impression previously unaddressed by Navajo Tribal courts.  Absent guiding precedent from the Navajo Tribal courts on the issue, the Court will apply general principles of constitutional law and statutory interpretation to the question at hand.

It is a general principle of European and American law that a subsequent legislative action can overturn a previous law.  NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND

STATUTES AND STATUTORY CONSTRUCTION § 1:3 (7th ed. 2015) (hereinafter "SUTHERLAND").[7]

In the American legal system, Article IV of the Constitution applies a similar legal principle to duly ratified treaties.  United States Constitution, Article IV Cl. 2 ("all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land").[8]  When a treaty between the United States and a foreign power conflicts with a pre-existing act of Congress, the text of the treaty controls and the act of Congress is no longer applicable.  *The Cherokee Tobacco*, 78 U.S. 616, 621 (1870) ("A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty."); *Alverez v. United States*, 216 U.S. 167, 176 (1910) ("an act of Congress, passed after a treaty takes effect, must be respected and enforced, despite any previous or existing treaty provision on the same subject."); *In re Air Crash Disaster Near Honolulu, Hawaii, on Feb. 24, 1989*, 783 F. Supp. 1261, 1262 (N.D. Cal. 1992) (same).  If a treaty is later in time, the treaty must be enforced over a domestic statute.  *Id.*;  *United States v. Felter*, 546 F. Supp. 1002, 1012 (D. Utah 1982), *aff'd*, 752 F.2d 1505 (10th Cir. 1985) ("If there is an irreconcilable conflict between language of a treaty and an act of Congress, the enactment that is later in time prevails.").

At issue in this case is Title 1 Section 554 of the Navajo Nation Code.  It was last amended in relevant part in 1992.  *See* 1 N.N.C.A. § 554 (2010).   Title 2, Section 223, the portion of the Navajo Nation Code relied on by the McNeals, was enacted in 2003, more than ten

---

[7] The case of Prohibition in the United States may be illustrative.  In 1920, the Eighteenth Amendment of the Constitution prohibited "the manufacture, sale, or transportation of intoxicating liquors[.]"  United States Constitution, XVIII Amend.  However, the Twenty-First Amendment to the United States Constitution, a subsequent constitutional amendment, repealed that prohibition.  United States Constitution, XXI Amendment ("Eighteenth Article of Amendment to the Constitution of the United States is hereby repealed.").  As a result of the ratification of the Twenty First Amendment, the Eighteenth Amendment was no longer valid.  Richard Albert, *Constitutional Amendment by Constitutional Desuetude*, 62 AM. J. COMP. L. 641, 678–79 (2014).

[8] This clause is also applicable to treaties with the Tribes.  *United States v. State of Mich.*, 471 F. Supp. 192, 265 (W.D. Mich. 1979).  This Court need not determine here whether it applies to tribal-state compacts.

years after the statute relied upon by Plaintiffs.  2. N.N.C.A § 223(C) (2010); Doc. 17, McNeal

Opp. to MSJ, at 4 ¶ 7; 17.  Plaintiffs do not dispute these facts.  Doc. 19, Reply ISO MSJ, at 1–5.

In addition, Section 223(C) of Title 2 of the Navajo Nation Code provides a specific procedure

for waiving sovereign immunity.  2 N.N.C.A. § 223(C) (2010).  Based on these facts and the

general principles of statutory interpretation applied herein, the most natural reading of the

Navajo Nation Code is that Title 1 Sections 551 *et seq.* defines the scope of Navajo sovereign

immunity.  Title 2 Section 223(C) of the Navajo Nation Code, a more specific statute which was

enacted later in time, provides a method for abrogation that sovereign immunity by the Navajo

Nation Council.  *Compare* 1 N.N.C.A. §554, *with* 2 N.N.C.A. § 223.  This comports not only

with the principle that statutes that are later in time can supersede previous statutes, but also the

principle of *in pari materia*, which holds that statutes dealing in the same subject matter should

be construed together if possible.  SUTHERLAND at § 51:5; Karl N. Llewellyn, *Remarks on the

Theory of Appellate Decision and the Rules or Canons about How Statutes Are to Be Construed*,

3 VAND. L. REV. 395, 402 (1950).

Tenth Circuit precedent instructs the Court to read statutes in such a manner.  *See State of

Utah, By & Through Div. of State Lands v. Kleppe*, 586 F.2d 756, 768–69 (10th Cir. 1978)

(citing SUTHERLAND, 4th ed.), *rev'd on alt. grounds, Andrus v. Utah*, 446 U.S. 500 (1980).  In

*Kleppe*, the Tenth Circuit explained that "[w]here one statute deals with a subject in general

terms, and another deals with a part of the same subject in a more detailed way, the two should

be harmonized if possible, but if there is conflict, the latter will prevail, regardless of whether it

was passed prior to the general statute, unless it appears that the legislature intended to make the

general act controlling."  *Id.*  Here, both the sequence of the statutes – 1 N.N.C. § 554 was

passed before 2 N.N.C. § 223 – and the specificity level of the statutes – Section 223 is more

specific than Section 554 – indicate under general principles of statutory interpretation that Section 223 should control.

The Navajo Nation Council seemed to have reached the same conclusion in deliberating on the Tribal-State Compact.  When addressing the issue of sovereign immunity, the Council itself chose to specifically follow the procedure specified in Section 223 when they authorized the Tribal-State Compact even though they were aware of the Navajo Sovereign Immunity Act and acknowledged both pieces of prior legislation in their resolution.  *See* Doc. 17-3, Resolution of the Navajo Nation Council, at 2 ¶ 7.  As a result of the Navajo Nation Council's deliberations, it appears that both Section 223 and Section 554 were considered and that the Navajo Nation Council believed that it had followed the legal requirements of both sections in abrogating the Navajo Nation's sovereign immunity.  *See id.*

The Court notes that even if Section 223 were not interpreted to allow the Navajo Nation Council to abrogate Navajo sovereign immunity as elaborated in Section 554, the Court would assume that Navajo law would recognize the Tribal-State Compact as the legal equivalent to a Navajo statute in the same way the laws of the United States recognize foreign treaties as equal to acts of Congress.  *The Cherokee Tobacco*, 78 U.S. 616, 621 (1870).  As a result, a Tribal-State Compact properly ratified by the Navajo Nation could also abrogate the Navajo Nation's sovereign immunity.  *Id.*  Under either theory, it appears that the Navajo Nation voluntarily abrogated its sovereign immunity here.

Ultimately, it is a matter of Navajo law whether the Tribal-State Compact, negotiated between the Navajo Nation and the State of New Mexico and seemingly appropriately ratified by both entities, can supersede the Navajo Nation Sovereign Immunity Act.  Based on the foregoing analysis, the Court has determined that the Tribal-State Compact, as ratified by a supermajority

of the Navajo Nation Council, can supersede the Navajo Sovereign Immunity Act.  This would clearly be the result if the rules of statutory interpretation commonly applied to state and federal statutes are used to interpret Navajo laws.

However, this Court is relatively unfamiliar with the constitutional law and rules of statutory interpretation of the Navajo Nation, and the Court recognizes that its interpretation of Navajo law could be in error.  If so, it could be that the Navajo Nation's ratification of the jurisdiction-shifting principle embodied in Section 8 of the Tribal-State Compact may be *ultra vires* and therefore void as Plaintiffs in this action assert.  This would certainly not be unprecedented.  For example, in *Pueblo of Santa Ana v. Kelly*, this Court determined that a failure to properly ratify a Tribal-State Compact by the State of New Mexico according to New Mexico state law was impermissible.  932 F. Supp. 1284 (D.N.M. 1996).  In that case, the Governor of New Mexico sought to enter into a  Tribal-State Compact without seeking adequate legislative approval.  *Id.*  Unlike *Pueblo of Santa Ana*, in this case, it appears that the relevant negotiating entity, the Navajo Nation, did follow all of the appropriate procedures for negotiating the Tribal-State Compact, including the necessary procedures for consenting to the jurisdiction of New Mexico state courts for resolving tort law actions arising on Tribal lands and related to Indian gaming.[9]

---

[9] Because of the Court's concern regarding this delicate issue of Tribal sovereignty, the Court notes for Plaintiff Navajo Nation that if Navajo constitutional law is similar in this regard to the constitutional law of the United States and the Navajo Nation is unhappy with the decision of this Court, the Navajo Tribal Council could simply pass a statute that invalidates the jurisdiction-shifting provision of the Tribal-State Compact.  *See, e.g.*, *Alverez v. United States*, 216 U.S. 167, 176 (1910) ("an act of Congress, passed after a treaty takes effect, must be respected and enforced, despite any previous or existing treaty provision on the same subject."); *In re Air Crash Disaster Near Honolulu, Hawaii, on Feb. 24, 1989*, 783 F. Supp. 1261, 1262 (N.D. Cal. 1992) (same).  The Court takes no position on whether such an act would constitute bad faith under the Tribal-State Compact.

IV.   **Federal Preemption: the Scope of Jurisdiction-Shifting Provisions Permissible under IGRA**

The alternative theory against New Mexico's jurisdiction advanced by the Plaintiffs is that IGRA limits the bargaining positions the Navajo Nation and New Mexico can take in negotiating the Tribal-State Compact such that any jurisdiction-shifting provision in the compact is impermissible under federal law.  Doc. 12, Pls. MSJ, at 9–15.  Specifically, Section 8 of the Tribal-State compact shifts jurisdiction to New Mexico state courts for adjudicating tort claims arising on Tribal land by stating that: "For purposes of this Section, any such claim may be brought in state district court, including claims arising on tribal land, <u>unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court</u>."  Doc. 12-1, Tribal State Compact, at 14 (emphasis added).  Pointing to the language in the second half of this clause, Plaintiffs argue that IGRA does not permit such jurisdiction shifting.  Doc. 12, Pls. MSJ, at 9–15.  Defendants argue, by contrast, that jurisdiction-shifting is permissible under IGRA.  *E.g.*, Doc. 17, Dalley Opp. to MSJ, at 3–5.

a.  **Federal Law Can Determine the Scope of Tribal Authority to Regulate Jurisdiction**

As a threshold matter, the Court recognizes that the Plaintiffs' have not asserted a theory that is impermissible on its face.  Although the Tribes are recognized as sovereign entities, federal law may limit a tribal court's assertion of its own jurisdiction.  *Strate v. A–1 Contractors,* 520 U.S. 438, 442 (1997).  Similarly, federal law can circumscribe the allocation of jurisdiction between the Tribes and the states.  *Pueblo of Santa Ana v. Nash*, 972 F. Supp. 2d 1254, 1262–63 (D.N.M. 2013).  As this Court previously held in *Pueblo of Santa Ana*: "Generally, absent clear federal authorization, state courts lack jurisdiction to hear actions against Indian defendants

arising within Indian country. . . . The exclusive jurisdiction of tribal courts may . . . be shifted to state court by a valid, clear tribal waiver of immunity[.]"  *Id.*  As a result, it is plausible that IGRA would limit jurisdiction shifting via the Tribal-State Compact such that Section 8 or a portion thereof is invalidated.

### b.  IGRA Does Not Prohibit the Negotiation of Jurisdiction-Shifting Provisions

While Plaintiffs' argument is plausible on its face, a close analysis of IGRA, its legislative history, and the precedent interpreting the statute indicates that IGRA does allow tribes and states to negotiate jurisdiction-shifting provisions in their tribal-state compacts.

As a general matter, IGRA gives Tribes and states broad discretion in negotiating tribal-state compacts.  *Artichoke Joe's Cal. Grand Casino,* 353 F.3d at 726; COHEN at § 12.05 ("The compact negotiated between individual states and tribes can define with particularity a state's role with regard to gaming activities on Indian lands." ).  Section 11(d) of IGRA, the Section principally focused on the regulation of Class III "Casino-style" gaming, provides, in pertinent part:

> **(A)** Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

> . . .

> **(C)** Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—

>> **(i)** the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

**(ii)** the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

. . .

**(vi)** standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

**(vii)** any other subjects that are directly related to the operation of gaming activities.

25 U.S.C.A. § 2710(d)(3). 25 U.S.C. § 2710(d)(3)(C) enumerates what terms may be negotiated in a tribal-state compact and specifically states that terms regarding the application of "civil laws and regulations . . . that are directly related to, and necessary for [the] regulation [of Indian gaming]" may be negotiated through the Tribal-State Compact. 25 U.S.C. § 2710(d)(3)(C)(i). The immediately subsequent statutory provision further provides that "the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations" may be a subject of negotiation for the Tribal-State Compact. 25 U.S.C. § 2710(d)(3)(C)(ii). In short, if tort liability can be viewed as "regulating" gaming activity then it falls within the scope of IGRA and can therefore be a subject of negotiation.

Plaintiffs cite no authority for the proposition that tort liability does not constitute regulation. *See* Doc. 12, Pls. MSJ, at 12–15; Doc. 19, Reply ISO MSJ, at 7–9. Contrary to Plaintiffs' position, it is a fundamental principle of the common law that tort law is a kind of regulation. *See* RESTATEMENT (SECOND) OF TORTS § 6 (AM. LAW INST. 1965) (describing liability arising from "tortious conduct" as a kind of regulation); *see generally* Dan B. Dobbs, *The Law of Torts* § 5–6 (2000) (explaining that tort law is a kind of regulation). As conservative legal scholar Richard Epstein has famously argued, tort liability is a type of regulation that predates the existence of the regulatory state. *E.g.*, Richard A. Epstein, *The Perilous Position of*

*the Rule of Law and the Administrative State*, 36 HARV. J.L. & PUB. POL'Y 5, 18 (2013). Because tort claims alleged against Indian gaming facilities are "directly related to" the regulation of tortious conduct arising out of Indian gaming, jurisdictional issues arising from such tort claims may be the subject of negotiation for a tribal-state compact. 25 U.S.C. § 2710(d)(3)(C)(i)–(ii).

Although jurisdictional issues regarding tortious conduct related to Indian gaming fall directly under the first two provisions of Section 11(d)(3)(C), even if this were not the case, they would also fall under the catchall provision in Section 11(d)(3)(C)(vii). This Section allows the Tribes and states to negotiate regarding "any . . . subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). Because tort liability resulting from "the operation of gaming activities" is "directly related to" the same, the catchall provision of Section 11(d)(3)(C) also provides authority for Tribes and states to negotiate the allocation of jurisdiction of such tort claims.

The legislative history of IGRA bolsters this Court's conclusion that IGRA allows Tribal-State Compacts to include jurisdiction-shifting provisions for tort law regulation of Indian gaming. As elaborated in Sections I and II, *supra*, the relevant legislative history demonstrates that IGRA was essentially a compromise between pro- and anti-Indian gaming interests. *Ducheneaux* at 166–70; COHEN at § 12.02. This compromise punted the regulation of Class III gaming to the states and the tribes through the negotiation of tribal-state compacts. *Id.*; *Mezey* at 721; *see Tsosie* at 51. The central piece of the legislative negotiation of IGRA was Section 11(d) of IGRA, which was codified at 25 U.S.C. § 2710(d). *See* 25 U.S.C. § 2710; *Ducheneaux* at 176. As the New Mexico Supreme Court explained in *Doe v. Santa Clara Pueblo*, "instead of Congress allocating jurisdiction between the tribes and states, [Section 11(d)] allowed the tribes and states to negotiate and decide for themselves the division of civil, criminal, and regulatory

responsibility."  141 N.M. 269, 278 (2007) (citing 25 U.S.C. § 2710(d)(3)).  As one commentator

has summarized: "The compact requirement . . . presented an opportunity for state jurisdiction,

albeit with the consent of tribal governments.  In sum, Congress 'punted' the issue of deciding

state versus tribal jurisdiction to the states and tribes to negotiate amongst themselves on a case-

by-case basis."  Sidney M. Wolf, *Killing the New Buffalo: State Eleventh Amendment Defense to

Enforcement of IGRA Indian Gaming Compacts,* 47 WASH. U. J. URB. & CONTEMP. L. 51, 86

(1995); *see also* Roland J. Santoni, *The Indian Gaming Regulatory Act: How Did We Get Here?

Where Are We Going?,* 26 CREIGHTON L. REV. 387, 407 (1993) ("Congress introduced the

Tribal–State compact concept, rather than require tribes to accept state law and jurisdiction, as a

condition to conducting Class III gaming.").  Because Section 11(d) was intended to allow Tribes

and states to negotiate for themselves how to regulate Class III gaming, this history strongly

suggests that the Class III compacting provision was intended to be broad enough to allow the

Tribes and the states to work out between themselves solutions to the jurisdictional issues that

had eluded Congress.  *See Doe*, 141 N.M. at 278–81.

As the Court has previously ruled, Congress intended that IGRA balance the states' and

Tribes' interests through the compact negotiation process.  *Pueblo of Santa Ana v. Kelly*, 932 F.

Supp. 1284, 1297 (D.N.M. 1996).  The Tenth Circuit, in affirming this decision, summarized the

legislative history of Section 11(d) of IGRA as follows:

> As the legislative history makes clear, Congress was concerned about striking a
> balance between the interests of tribes and of states in class III gaming. Thus, the
> Act gives states multiple chances to negotiate a compact governing the conduct of
> such gaming. . . . Congress could have permitted Indian tribes to conduct any kind
> of gaming on Indian lands without any involvement by states. The fact that it
> provided states with several opportunities to become involved through the
> compacting process suggests Congressional concern to permit state involvement
> if a state so desires [and the Tribe at issue consents].

*Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1555–56 (10th Cir. 1997).  In essence, the Tenth Circuit has held that tribal-state compacts should be treated as contracts.  *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556–58 (10th Cir. 1997) (explaining that compacts are a "form of contract," and that, "[a]s with any contract, parties entering into one must assure themselves that each contracting party is authorized to enter into the contract.").  The Tenth Circuit recently confirmed and clarified this position in *Santana v. Muscogee (Creek) Nation, ex rel. River Spirit Casino* by applying it specifically to a jurisdiction-shifting provision within a tribal-state compact between Oklahoma and the Creek Nation.  508 F. App'x. 821 (10th Cir.2013), *cert. denied,* 133 S.Ct. 2038 (2013).  In that case, Mr. Santana invoked a tribal-state compact to sue the Creek Nation in Oklahoma state court.  *Id.* at 822.  Mr. Santana claimed the Creek Nation induced him to gamble at its casino, resulting in the tribe's unjust enrichment.  *Id.*  The Creek Nation removed the suit to federal court and argued that its compact with the State of Oklahoma did not extend jurisdiction to Oklahoma state courts to hear civil tort claims against the Tribe because state courts were not "courts of competent jurisdiction" under the terms of the compact.  *Id.*  A unanimous three-judge panel of the Tenth Circuit agreed and affirmed the District Court by applying the principles of contract law to the tribal-state compact at issue.  The Tenth Circuit found that the compact between Oklahoma and the Creek Nation "expressly provided that '[t]his Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction.'"  *Id.*  The Tenth Circuit held that because of the foregoing provision, another provision in the tribal-state compact at issue that used the phrase "court of competent jurisdiction" could not be reasonably read to include Oklahoma's state courts.  *Id.* at 822–23.  In short, the Tenth Circuit has held that the terms of the particular tribal-state compact at issue determine the scope of a given jurisdiction-shifting provision within that compact.  *Id.*

Numerous courts have followed the lead of the Tenth Circuit and determined that the issue of jurisdiction shifting should be determined based on the particular terms of the tribal-state compact at issue. *See, e.g., Diepenbrock v. Merkel*, 33 Kan. App. 2d 97, 104–05 (2004); *Bonnette v. Tunica-Biloxi Indians*, 873 So. 2d 1, 5–7, *on reh'g* (Mar. 24, 2003); *Kizis v. Morse Diesel Int'l, Inc.*, 260 Conn. 46, 57–58 (2002); *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 315 P.3d 359, 365–66 (Okla. 2013) ("The intention of the parties to the negotiation of the model gaming compact is clear. The Governor of the State of Oklahoma did not negotiate an allocation of civil-adjudicatory jurisdiction to the courts of this state."); *see Gallegos v. Pueblo of Tesuque*, 132 N.M. 207, 218 (2002) ("The 1997 Compact is a contract between the State of New Mexico and Tesuque, codified by the Legislature"); *Confederated Tribes of the Chehalis Reservation v. Johnson,* 135 Wash. 2d 734, 750 (1998) ("Tribal-state gaming compacts . . . are interpreted as contracts."). Thus, for example, in *Kizis v. Morse Diesel*, the Connecticut Supreme Court determined that civil tort actions arising under the IGRA could not be brought in Connecticut courts because the tribal-state compact at issue in that case:

> explicitly place the present type of tort action in the jurisdiction of the tribe's Gaming Disputes Court. . . . Although Connecticut has a genuine interest in providing a judicial forum to victims of torts, the gaming act provided the state with a mechanism to negotiate with the tribe, to establish the manner in which to redress torts occurring in connection with casino operations on the tribe's land. As a result of these negotiations, the tribe maintained jurisdiction over tort actions of this type.

*Kizis*, 260 Conn. at 57–58. In short, the compact between Connecticut and the Mohegan Tribe required civil tort actions to be brought in Tribal court. By contrast, Section 8 of the Tribal-State Compact in this case authorizes the state of New Mexico to exercise jurisdiction over personal injury claims arising on Tribal land related to Indian gaming, stating that: "For purposes of this Section, any such claim <u>may be brought in state district court</u>, including claims arising on tribal

land[.]"  Doc. 12-1, Tribal State Compact, at 14 (emphasis added).  Thus, under the contract-law reading of tribal-state compacts by the Tenth Circuit, the Navajo Nation and the State of New Mexico have determined between themselves that state court jurisdiction is appropriate here.

In summary, the text of Section 11(d) of IGRA indicates that it is entirely appropriate that Tribes and states negotiate the allocation of jurisdiction to adjudicate tort actions related to Indian gaming.  The legislative history bolsters, rather than contradicts, this plain-language interpretation.  Because in the Tribal-State Compact at issue here the Navajo Nation and the State of New Mexico did negotiate a jurisdiction-shifting provision that governs the McNeals' personal injury action, the results of that negotiation should be honored and New Mexico should be allowed to exercise jurisdiction in this case.

Because the Plaintiffs in this action have not demonstrated that state court jurisdiction is inappropriate in this case, and because Defendants have demonstrated that state court jurisdiction is appropriate, Plaintiffs' motion for summary judgment is DENIED.

## CONCLUSION

The Navajo Nation has inherent authority to waive its sovereign immunity and waived its sovereign immunity to the state-court action at issue here when it ratified the Tribal-State Compact.  The Navajo Sovereign Immunity Act does not prohibit this waiver.  Instead, subsequent legislation and the ratification of the Tribal-State Compact itself abrogated the Navajo Nation's sovereign immunity.  As a result, the Plaintiffs cannot rely on the Navajo Sovereign Immunity Act to invalidate Section 8 of the Tribal-State Compact.

The IGRA also does not prohibit the Navajo Nation's waiver of sovereign immunity.  Instead, the IGRA embodies contract-law principles that encourage the Tribes and states to

determine for themselves the appropriate allocation of jurisdiction under IGRA.  As a result, the Plaintiffs cannot rely on IGRA to invalidate Section 8 of the Tribal-State Compact.

The Court reiterates is sentiments, expressed above in Footnote 9, that the Navajo Nation's waiver of sovereign immunity is based fundamentally on the Tribe's consent to be sued in New Mexico courts under Section 8 of the Tribal-State Compact.  Nothing presented before the Court suggests that Section 8 was the result of coercion, undue influence upon the Tribe, or any other equitable doctrine that would undermine the force of the Navajo Nation's consent to that provision.  If the results of this opinion are offensive to the Navajo Nation, the Tribe may consider withdrawing its consent either through legislation by the Navajo Nation Council, the renegotiation of the Tribal-Sate Compact, or some alternative method.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Summary Judgment [Doc. 12] is DENIED.  Because there are no more issues left to adjudicate in this declaratory judgment action, this case will be DISMISSED.

DATED this 3rd day of August, 2016.

_____
MARTHA VAZQUEZ
United States District Judge